# Commonwealth ex rel. Whelen *versus* Select and Common Councils of the City of Pittsburgh.

1. The writ of mandamus is the appropriate remedy to compel city authorities to assess and levy taxes to pay bonds of the municipality, issued for improvements.

2. Certain bonds purport to be bonds of the city of Pittsburgh, are signed by the mayor and controller, countersigned by the Penn Avenue committee and have the corporate seal affixed, and for their payment the faith and credit of the city were pledged.    If issued to the holder for a valuable consideration, the city is liable for the same.

3. A municipality may issue its bonds or evidences of indebtedness for a debt lawfully contracted in the proper performance of its municipal duties.

4. The holders of said bonds are not bound to look to the assessment against the property abutting on the avenues improved made for the purpose of paying the bonds.

[Commonwealth *v.* Councils of Pittsburgh.]

November 11th 1878. Before AGNEW, C. J., SHARSWOOD, MER-CUR, GORDON, PAXSON and TRUNKEY, JJ. WOODWARD, J., absent.

Error to the Court of Common Pleas, No. 1, of *Allegheny county:* Of October and November Term 1878, No. 92.

The petition in this case, for a writ of mandamus, was filed on behalf of Henry Whelen, against the Select and Common Councils of the city of Pittsburgh. It averred that by virtue of an Act of Assembly, approved April 2d 1870, and of the supplements thereto, approved February 1st 1871 and March 20th 1872, the improvements in the grading and paving of Penn avenue and other streets and avenues of Pittsburgh, had been made at great expense; that for the purpose of providing for the cost of the same, in pursuance of the said Act of Assembly, the commissioners elected to superintend said work, made requisition upon the mayor of the city of Pittsburgh for the issue of its bonds; that the mayor, in pursuance of said requisition and of the authority conferred upon him by said act, from time to time made and executed bonds of said city for the contract price and the incidental expenses of said improvements, the amount of the issue being $5,823,800; that the bonds so issued were duly signed by the mayor, countersigned by the controller, and sealed with the corporate seal of the city; that said bonds, bearing different rates of interest, were delivered to the said commissioners, and by them negotiated, and the proceeds thereof paid to the treasurer of the said city; that the proceeds were applied to the expense and cost of the improvements in question; that said bonds have been presented to the treasurer of the said city and have been duly registered; that the petitioner, as a member of a firm, is the holder and owner of said bonds, amounting to the sum of $9500, and he is also the agent of the several trust companies mentioned, who hold, in a fiduciary capacity, a large amount of said bonds as trustees; that the amount of interest in arrears on said bonds is $398,514; that said interest accrued in 1877, and a larger amount accrued in 1878; that there is the sum of $46,500, the principal of bonds issued as a temporary loan under the Act of April 2d 1870, due on the 1st January 1877.

Annexed to the petition is a statement of the interest and of the bonds, and of the dates of their maturity. It further avers that it is the duty of the city to make annual appropriations, and apply the same to the payment of the salaries of the city's officers, and to the payment of the original current expenses of the city, and to the payment of the interest on the funded debt of said city; that it is the duty of said councils in case there are no funds with which to pay the same to make temporary loans to do so; that said councils have disregarded their duty and have not made any appropriations, and have made no temporary loan for the purpose of paying the same; that it is the duty of said councils annually to make appropriations to pay interest of its funded debt and to provide for such

[Commonwealth *v.* Councils of Pittsburgh.]

appropriation by assessments and collection of taxes; that the said councils have failed to pass an appropriation ordinance for the purpose of making such appropriation; that by their act in refusing to pass an ordinance they have evidenced an intention to refuse to provide for the payment of the interest. The petitioner, and those holding the bonds, have been unable to collect their interest, although they have demanded the payment of the same.

The petitioners then pray for a mandamus compelling said councils forthwith to make full and ample provision for the payment of all the interest now due on said bonds, and that which may become due thereon during 1878; that they be commanded to assign and appropriate out of the revenue of said city sufficient money derivable from all sources to pay the funded debt of said city, giving preference to these bonds, if there be any deficiency in the payment of said interest, before paying the salaries of the city officers, and the ordinary current expenses of the city.

The return of the respondent admits that under and in pursuance of the authority contained in the Acts of Assembly, that the curbing, paving and improvements alleged were done; that upon the requisition of the commissioners the bonds were duly issued; that the bonds were of the following form:—

REGISTERED BOND.

United States of America, State of Pennsylvania.

CITY OF PITTSBURGH.

$

ELLSWORTH AVENUE BOND.

*Know all men by these Presents,*

That the City of Pittsburgh is indebted to
or assigns, in the sum of
lawful money of the United States, which sum of
the said City of Pittsburgh          promises to pay to the said
                                                                or assigns,
at the office of the Treasurer of said City, on the 1st day of April, One Thousand Eight Hundred and Eighty-five, with interest at the rate of seven per centum, payable semi-annually, on the 1st days of October and April, of each year, and for the true and faithful payment of the said sum of
and the semi-annual interest thereon as aforesaid, the faith, credit and property of said City of Pittsburgh are hereby solemnly pledged.

This bond is issued for the Ellsworth Avenue Improvement, in pursuance of an Act of the General Assembly of the Commonwealth of Pennsylvania, entitled "An act to provide for the improvement of Penn avenue and other avenues and streets in the City of Pittsburgh," approved the 2d day of April, A. D. 1870, and supplements thereto, and an ordinance of the Councils of said city, adopted on the 9th day of December 1872, authorizing the grading and paving of Ellsworth avenue, from Penn avenue to Neville street, and the election of Commissioners for that purpose. This bond transferrable on the books of the Treasurer of said City, and not otherwise.

In witness whereof, the said City of Pittsburgh has caused this bond to be signed by the Mayor and countersigned by the Controller of said City, and the corporate seal to be hereunto affixed this 1st day of April, A. D., One Thousand Eight Hundred and Seventy-three.

That the commissioners sold and negotiated said bonds, and that the city did not receive the proceeds of the same; that the commissioners for each street received the proceeds of the sale of the said bonds issued for the respective streets and avenues, and placed the same upon deposit with the city treasurer, and the same were paid out upon the requisition of said commissioners for the payment of the improvements of the respective streets; that said moneys were kept separate from the funds of the city; that the city had no control or supervision of the same; that the petitioners knew these bonds; it admits that many of the bonds have been duly registered; that the petitioner is the holder of bonds and the agent of other parties who hold the same; that there is over-due and unpaid interest for the year 1877; it also admits the issue of $46,500 of bonds for temporary loan. The failure is admitted to provide for the payment of the interest on its bonds; but it is denied that the bonds held by Whelen and others are part of the city funded debt, and that the respondents have in any manner failed to perform the duty required by them. The answer further admits the authority of the city to make temporary loans for the payment of interest upon its funded debt, and that they have failed to make the appropriation to pay the interest on said bonds; that prior to the Act of April 2d 1870, the cost and expense of streets and avenues of said city were paid by assessments upon the property abutting upon each of said streets and avenues, without expense to the city; that the owners of property procured the passage of the said Act of April 2d 1870, and in pursuance of the same, the said avenues were paved, and the bonds issued for the same, amounting to the sum of $4,436,900; that the total cost of street improvements was assessed upon property fronting or abutting upon the respective streets and avenues, in accordance with the said act; that a list of owners was duly made out, with the amounts of the assessment stated and due notice thereof given; that the requirements of the act were duly followed; that the aggregate of said assessment exceeded $4,436,900, and are liens upon the property abutting on said streets; that said assessments are payable in ten equal annual instalments, bearing interest at the rate of seven per cent. per annum; that there was due, January 1st 1877, a sum exceeding $1,000,000 of said assessments, more than sufficient to pay the interest due on said bonds, and that there is now due more than sufficient to pay interest for 1878; that respondents have requested the city attorney and the city treasurer to proceed speedily to collect the instalments that are due upon the assessments; that these bonds were issued and sold upon the faith and credit of said assessment made to pay upon the abutting property of each street, and that the petitioner and those he represents, with this knowledge, purchased said bonds. It avers that the debt of the city of

[Commonwealth *v.* Councils of Pittsburgh.]

Pittsburgh was $7,527,300, and that the assessed value of the property of said city is $19,614,975; that the amount of bonds issued under Act of April 2d 1870, was $2,134,600; that the amount of the indebtedness, including said last-mentioned sum, would be $9,661,900; that under the Act of April 2d 1870, there had been issued $4,652,700 of bonds; that said amount of bonds are included in the amount named in this petition, and were issued under the authority contained in the Act of April 2d 1870, and with the assent of the electors of said city.

The portions of the Act of April 2d 1870, referred to in respondents' answer that are material, are as follows:—

Sect. 12. For the purpose of providing for the payment of the cost and expense of said improvements, the said commissioners shall be authorized, from time to time, as the work progresses, to make requisition upon the mayor of the city of Pittsburgh for the issue of bonds of said city, in such sums as they deem best; and it shall be the duty of the said mayor to make and execute bonds in the name of said city, to an amount not exceeding the amount of the contract price for said work, and the incidental expenses attending the same; said bonds shall be known as Penn Avenue bonds; they shall be signed by the mayor and countersigned by the controller, and sealed with the corporate seal of said city; they shall be all of the same date, and they shall be payable twelve years after date, and redeemable at any time at the option of said city; they shall bear interest at the rate of seven per centum per annum, payable semi-annually from date, principal and interest payable at the office of the treasurer of the city of Pittsburgh; the said bonds shall be free of taxation.

Sect. 15. All moneys received by the city treasurer from the sale of said bonds shall be kept by him in a separate fund, and paid out on requisition of said commissioners, accompanied with an affidavit of the secretary or a member of said commission, that work has been done or materials furnished to the amount of said requisition, and that the money is required for payment of the same; all moneys received by the city treasurer shall be kept in the same manner and subject to all the regulations regarding other moneys of the city, except that he shall keep a separate account of the same; all interest received upon the same shall be credited to this fund.

Sect. 22. All moneys received from assessments shall be appropriated, under direction of the finance committee of the councils of the city of Pittsburgh, to the payment of the interest and the redemption of the bonds which may be issued for said improvement; if any interest shall become due on said bonds, where there is no fund from which to pay the same, the councils of the city of Pittsburgh shall be authorized to make a temporary loan for the purpose of paying the same.

[Commonwealth *v.* Councils of Pittsburgh.]

The demurrer to the answer was heard before the court below, consisting of Collier and Bailey, JJ., and the court being equally divided, judgment was entered in favor of the respondents. The following opinion was filed by Bailey, J. :—

" ' In mandamus cases,' Mr. Justice THOMPSON says, ' the establishment of a duty and the obligation to perform it, is upon the plaintiff to show, and this is considered as done, prima facie, when the court awards the (alternative) writ.' Commonwealth ex rel. Armstrong *v.* Allegheny County, 1 Wright 279. This may be the case where the practice still prevails to have a preliminary hearing, upon motion or rule with notice to the proposed respondent, before the granting of the alternative writ. Such has not been the practice of this court, and was not in this case. When the suggestion is presented by counsel of proved ability and integrity, the practice has been to grant the writ upon mere statement of the case, without even the reading of the suggestion, and such was the course here. And this would seem the better practice ; courts in modern days cannot give the time to hearing a preliminary argument, and a second, after return to the writ, when one will suffice ; and it would be a useless expense to make two services, when one can be made to answer all the ends of justice.

" Counsel for the relator explicitly recognised this practice, and the fact that the court had, in granting this writ, determined nothing. Had this not been done, I could not have consented that the case should have been heard in its present shape, lest the injustice should have been done the respondents of depriving them of the right to contest the case made by the relator.

" The great chief justice of this state declared in Commonwealth *v.* Canal Commissioners, 2 P. & W. 518, that the granting of a writ of mandamus ' involves the exercise of extraordinary power, which fits it for use only in extraordinary cases, where there would be otherwise a failure of justice.' See Commonwealth ex rel. *v.* Henry, 13 Wright 538. In order to involve the exercise of this power, the relator must establish in himself ' a right to enforce, which is specific, complete and legal, and for which there is no other specific, legal remedy.' Heffner *v.* Commonwealth ex rel., 4 Casey 112. And that this right rests upon ' some duty that those to whom it may be directed owe to the public, and upon their obligation to perform it.' Armstrong's Case, *supra.*

" The command of this writ is, that the councils of the city of Pittsburgh ' make full and ample provision for the payment of all the interest now due on said bonds (Penn Avenue bonds), and that which shall become due thereon in the year 1878, by the assessment and collection of such taxes as may be necessary for the purpose, and that you assign and appropriate, out of the revenue of said city, derivable from all sources, sufficient moneys for the payment of the interest of the funded debt of said city, so as aforesaid in arrears,

[Commonwealth *v.* Councils of Pittsburgh.]

and to become due,' or the cause wherefore you cannot, &c.    As I understand the counsel of the relator, they claim that the relief thus sought is two-fold.    First, that the councils make provision for the interest by the assessment and collection of a specific tax ; and second, that they appropriate sufficient for this purpose out of the revenue derived from taxes, assessed for general municipal purposes.    If this were so, the relator would have failed to define the duties resting upon the respondents, and his writ would be bad. But the command may possibly be construed to be single.

" In order to maintain the duty and right set forth, it is essential that the bonds referred to shall be bonds of the city, and also that they shall constitute a part of its 'funded debt.'    The writ, however, nowhere states in terms that the bonds were issued by the city of Pittsburgh, nor that they form a part of such 'funded debt.'

" As in the case of a return, the writ must set forth its case with certainty, and not argumentatively nor inferentially :  Armstrong's Case, *supra.*

" The writ, after setting forth the Acts of Assembly, by authority of which the bonds were issued, proceeds to state that the commissioners controlling the grading and paving of Penn and other avenues, ' made a requisition upon the mayor for the issue of the bonds of the city,' and that 'the mayor did make and execute bonds in the name of the city' to the sum of nearly $6,000,000 ; that they were signed by the mayor, countersigned by the controller, sealed with the corporate seal, and delivered to the commissioners.    As it is not alleged that the mayor and controller constitute the legislature of the city, and it does appear that there exist city councils, this is entirely consistent with the fact that the councils may not have ordered their issue.

" If the writ had asserted that the relator was the owner of certain bonds of the city, this might have been construed as an allegation that they had been issued by the city ;  but when the writ says that he was the owner of certain 'bonds of the city of Pittsburgh, issued under the said Act of Assembly,' it adds nothing to, but merely refers us to what has been set forth before.

" If the relator cannot assert that the bonds were issued by the city, he fails to show an obligation upon respondents to provide for the interest, and if the fact be that they were so issued, and he has failed, as we have seen, to so aver, his pleading is bad.

" The same defective pleading appears with respect to the matter of the 'funded debt' of the city.    The relator finds the 'duty' of councils in the enactment that they shall provide for the interest upon the funded debt, and he should have averred clearly that his bonds are part of such debt.    The writ sets forth that there is in arrear, interest on his Penn Avenue bonds, and complains that councils have failed to appropriate 'sufficient moneys for the pay-

[ Commonwealth *v.* Councils of Pittsburgh.]

ment of the interest of the funded debt of said city, so as aforesaid in arrears;' this is wanting in the required certainty in pleading.

"The Act of 1870 was no act, until, as provided in section 25, it was 'approved' by councils. The writ nowhere alludes to this condition precedent, much less alleges its performance. The truth is that the action of councils was of the most informal character. This 'approval' seems, to have been regarded as so unimportant a matter that the trouble was not taken to frame a resolution on the subject, and there was consequently no recording or advertising of the action, as was essential.

"But the fault is not with the pleader; he has asserted all that he honestly could, and what he could honestly assert is not enough. If to demonstrate that his bonds are extraordinary in character were to prove his right to this 'extraordinary remedy' the relator's task would have been an easy one.

"The Penn Avenue Act of the 2d of April 1870, enacts that the owners of abutting property upon a specified part of said avenue, should elect, in a manner prescribed, five of their number to be commissioners, to control the paving and grading of such part of the avenue—the commissioners shall fill vacancies in their number, arising from the member ceasing to be an owner of abutting property, or otherwise—the commissioners shall have unlimited power to determine the kind and description of pavements, and to make contracts; such contracts to be in the name of, and the contractor to give bond to the city. The commissioners were authorized to make requisition upon the mayor for the issue of bonds of the city, in such sums as they deemed best. It shall be the duty of the mayor to execute bonds in the name of the city, to be signed by him, countersigned by the controller, and sealed with the corporate seal; the commissioners to negotiate the bonds in such manner as they might think best, to pay the proceeds to the treasurer of the city, who should keep the same in a separate fund, and pay it out on the requisition of the commissioners. When the work was done, the commissioners were to ascertain the cost, and assess it equally per foot front on the abutting property, prepare a plot of the improvement, and schedule of assessments, give notice of time for correcting errors, make the corrections, and file the schedule in the prothonotary's office, as a lien; and the act then provides for the payment of assessments at the office of the city treasurer, and for the collection of the unpaid assessments by the city attorney; which collections were to be appropriated, under the direction of the finance committee of councils, to the payment of the interest on, and the redemption of the bonds.

"It will be seen how scrupulously the city has been excluded from every right and duty, under this act. It shall not select the commissioners, nor issue the bonds, nor control the amount of the issue, nor determine the character or cost of the pavement, nor make, nor

[Commonwealth *v.* Councils of Pittsburgh.]

regulate any contract, nor negotiate the bonds, nor receive the proceeds into its treasury, nor supervise their disbursement, nor determine whether the contracts had been properly fulfilled, nor whether the street was good or bad, nor assess the cost, nor correct the assessments, nor file the liens, nor supervise nor enforce their collection, nor receive them into its treasury when collected, nor apply them, through its officers, elected for such purposes, to the payment of bonds, or their interest.

"It is quite clear that the legislature meant to empower the commissioners to require the issue of bonds in the name and sealed with the seal of the city, and to command the officers of the city as their servants, as they might require. It is equally clear that these bonds, thus issued, can bind the city no further than the legislature has disclosed, either expressly or by necessary implication, the intention that they should. It is not clear that the legislature intended they should be a debt of the city at all.

" To borrow money and to issue bonds therefor are the highest acts of legislation. ' Such powers do not belong to a municipal corporation as an incident of its creation. To be possessed they must be conferred by legislation :' The Mayor *v.* Ray, 19 Wall. 475. See Commonwealth *v.* Erie & Northeast Railroad Co., 9 Harris 351; Same ex rel. *v.* Allegheny County, 1 Wright 290 ; Same *v.* Same, 7 Id. 391.

" The city councils could not, under the Penn Avenue Act, have issued even one bond. It conferred no power upon them, and these bonds are solely the creature of this act. As the city authorities could not have issued these bonds, even had they so desired, and the act does not expressly or by implication declare that the city shall resort to taxation (the only implied mode of paying municipal debts), to raise one dollar to pay principal or interest, it is just to assume that the legislature did not so intend. The 1400 pages of statutes, passed in 1870, among which this act appears, do not indicate that the English language was used with such parsimony at Harrisburg that the legislature could not have spared the few words more that would have expressed this intention, had they entertained it. It would have been so very simple a matter for that body to have said that the city was to pay these bonds, and they have taken such great pains not to say it that we need not ascribe its absence to mistake.

" Again : the legislature, in the manner fully set forth in the return, enacted for this city, the system of local assessments for the opening, grading and paving of streets, even to the extent of assessing the older parts of the city for the streets on which they abut, though these had been improved by general taxation long years before: Magee *v.* City of Pittsburgh, 10 Wright 358.

" The Penn Avenue Act was in furtherance of this system. The locality had to bear the burden. What more reasonable than that

[Commonwealth *v.* Councils of Pittsburgh.]

the citizens of the locality should control the expenditure of their own money, and as they would thereby furnish a street for the whole city, that they should have the use of the city officials and machinery to aid them. The theory of the relator, however, would reverse the entire system. It would throw a debt of millions upon the whole city for a purpose which the legislature had for years declared was a local improvement, to be paid for exclusively by the locality benefited. Such a reversal of an established system of legislation must more clearly appear, to be accepted as the intention of the legislature.

"Moreover, in establishing this system of local assessments for local benefits, the legislature, by Act of the 6th of April 1850, required the city to fund its debt, and to provide a sinking fund for its extinguishment, and therein provided by sect. 4, 'that it shall not be lawful for the said councils to issue, or authorize to be issued, any bonds, certificates of loan or of indebtedness, nor any other device as evidence of any indebtedness for or on account of any contract or engagement or undertaking hereinafter entered into under the authority of said councils for grading, paving, re-paving or repairing any streets, lanes or alleys in said city, or for sewerage of the same.'

"If this section was not repealed by the Penn Avenue Act, councils could not have issued these bonds. The section was not repealed by nor referred to in the Act of 1870.

"The law does not favor repeals of statutes by implication, and the burden is upon the party claiming it, to show a 'strong and clear inconsistency' between the acts : Street *v.* Commonwealth, 6 W. & S. 212 ; Society *v.* Philadelphia, 7 Casey 181. The act of 1850 is in the nature of a contract with the tax-payers, and that of 1870 will bear a construction perfectly consistent with sect. 4 of the former.

"Still further : when the legislature passed the Act of the 16th of May 1857, assessing per foot front, the cost of the old streets upon the abutting property, which had been for years taxed for their improvement, in consideration of such tax, they provided that 'the property so assessed and taxed, as aforesaid, shall not be liable for, or taxed, or assessed at any time thereafter, for preparing, grading, or paving on any other street, lane, alley or square within the limits of the said city.' This contract was not repealed in terms by the Penn Avenue Act, and could not be repealed by any implication, however 'strong or clear.' The legislature therefore did not mean to repeal this provision. If these avenue bonds are a debt of the city, and the principal or interest be paid out of the city taxes, it must be done in violation of this subsisting contract, the consideration of which has been paid by the old city.

"But if the legislature did intend to bind these bonds upon the city, their power so to do is more than doubtful.

[Commonwealth *v.* Councils of Pittsburgh.]

" A highly respectable authority, the Illinois Supreme Court, has adjudged repeatedly upon general principles, that ' no well regulated mind can entertain the idea that it is within the constitutional competency of the legislature to compel any one of our many cities to issue its bonds, against its will, to erect a park, or for any other improvement—to force it to create a debt of millions—in effect, to compel every property owner in the city to give his bond to pay a debt thus forced upon the city:' People *v.* Chicago, 51 Ill. 17 ; Marshall *v.* Silliman, 61 Id. 218. However, our own case of Philadelphia *v.* Field, 8 P. F. Smith 320, holds that it is competent for the legislature to create, without the consent of the city, ministerial · officers, who may contract a debt, of which the same legislature may compel the city to provide means of payment. But neither Philadelphia *v.* Field, nor any other case which the zeal of counsel has disclosed, has held that the legislature can authorize a few rural property holders in the outskirts of the city, representing nobody but themselves, under the pretence of making a local improvement, to absorb the highest legislative functions of the councils, representing the whole city, and to borrow money and issue bonds of the city, which shall be binding upon every taxpayer.

" It is true, according to some decisions, that municipal corporations are as subject to legislative caprice, as is clay in the hands of the potter. To say, however, that the legislature may ' erect, change, divide, and even abolish at pleasure,' a municipal corporation, is to stop far short of saying to its people, we have permitted you to borrow money and to issue bonds through your representatives ; we will now create a power which does not represent you, which shall also issue bonds for you, and shall apply the money borrowed thereby to local and not to municipal uses. This too nearly resembles the state of things put by BLACK, C. J., in the Sharpless Case, 9 Harris 169: 'Taxation is a mode of raising revenue for *public* purposes. When it is prostituted to objects in no way connected with the public interests or welfare, it ceases to be taxation, and becomes plunder.'

" Again, the citizens of the other wards, under the provisions of the Act 16th May 1857, paid the consideration, which the legislature had declared was to give them a perpetual exemption from assessment or taxation for the improvement of other streets. To hold now that the legislature may enact that the bonds for the grading and paving of Penn avenue shall be binding upon the whole city, and that a tax can be levied upon the older wards to pay the interest thereon, would be to sustain a ' law impairing contracts.' See Society *v.* Philadelphia, 7 Casey 182 ; Philadelphia *v.* Fox, 14 P. F. Smith 181.

" It is, happily, not needful in order to give force and effect to

[Commonwealth *v.* Councils of Pittsburgh.]

the legislative action to adopt a construction which will involve any or all of these consequences.

" But, if this were all otherwise, the relator finds his right to rest only upon the duty of councils to levy a tax for the payment of the interest on the 'funded debt.' As we have seen, he has failed to claim that his bonds are part of the funded debt; so has he failed to establish it as a fact.

" By the Acts of the 6th of April 1850, the 26th of May 1851, the 11th of April 1862, and others, the city was required to provide a sinking fund for the extinguishment of certain portions of the city debt. There are other portions which are not entitled to this security. In the latter category are these Avenue bonds, even assuming them to be debts of the city. If the term be more than an idle name, and 'funded' was intended to distinguish one class of debts from all others, that must be the 'funded debt,' for whose security the law has provided the greatest safeguards. In this view we must assume that the 'funded debt' is that for whose payment the sinking fund was established, and the duty imposed upon councils, by express enactment, to provide annually for the interest, even though the city officers should go unpaid. Could municipal solicitude and unselfishness further go ?

" This signification of 'funded debt' is confirmed by the original meaning of the term 'funds,' which was the security upon which loans were advanced, and by the mode by which portions of the debt of the British government have become 'funded.' Whart. Law Dic., title 'Funds.' It will be seen that it was deemed necessary to make, in express terms, the railroad compromise bonds part of the 'funded debt' of the city by Act of the 11th of April 1862.

" As has been shown, the Act of 1870 provides a fund for the payment of principal and interest of these bonds, derived, as it should be, from assessments upon the limited locality for whose benefit the expenditure was made, and appropriates that fund to this exclusive object. From the care with which it is provided that these assessments are made payable 'at the office of the city treasurer,' and not even 'to the treasurer,' as is the phrase used, when the act speaks of payments of the proceeds of the bonds, and the designation of a special committee to see to their application, to the exclusion of the city controller, it would seem to be the design that these moneys should not go into the treasury of the city, nor under the control of the city officers.

" But, however this may be, the fund thus appropriated is a trust, which could be diverted to no other use : Maenhart *v.* New Orleans, 2 Woods 108. It is not a fund provided for the reimbursement of the city, but, as the act says, 'for the redemption of the bonds.' No duty was imposed upon the city to see to its collection, and no right was conferred upon the city to interest itself in the subject. From such premises it would be difficult to deduce that

[Commonwealth *v.* Councils of Pittsburgh.]

the city was bound to produce still another fund, and that by taxation of those who had been studiously excluded from all duties and rights in the matter.    See Navigation Co. *v.* Newbern, 7 Jones (N. C.) 279; United States ex rel. *v.* New Orleans, 2 Woods 230.

"It is quite clear that the 'approval' by councils of the Act of 1870, conferred no power upon the commissioners either to issue these bonds or to make them binding upon the city, because—

"1st. The legislature had not clothed the councils with power to borrow money for this purpose, and there was nothing they could delegate.

"2d. If they possessed the power, they could not delegate it. 'Among the primal axioms of jurisprudence, political and municipal, is to be found the principle, that an agent, unless expressly empowered, cannot transfer his delegated authority to another, more especially when it rests in a confidence, partaking the nature of a trust, and requiring for its due discharge, understanding, knowledge and rectitude:' Parker *v.* Commonwealth, 6 Barr 515; Philadelphia *v.* Fox, *supra.*

"3d. The Act of the 6th of April 1850, section 4, provides not only 'that it shall not be lawful for councils to issue,' but 'to authorize to be issued any bonds,' or any other device, as evidence of indebtedness thereafter for grading or paving any street, lane or alley in the city.

"And we have seen the character of this 'approval' by councils. From the manner in which this action was had, it would seem impossible that any councilman could have thought he was thereby binding the city in a solemn manner to the payment of an unlimited debt.

"And of all this, the relator and every purchaser of one of these bonds are charged by law with the knowledge.    Upon the face of these bonds, in conspicuous type, was printed 'Penn Avenue Bonds;' the Act of the 2d of April 1870 was set forth as the authority for their issue, and the counter-signatures of the commissioners of the avenue distinguished them from all other bonds upon which the city seal appeared; all in a manner to challenge attention.

"Of this state of facts, the law says: 'Every man is chargeable with notice of that which the law requires him to know, and of that which, after being put upon inquiry, he might have ascertained by the exercise of reasonable diligence.    Every dealer in municipal bonds, which upon their face refer to the statute under which they were issued, is bound to take notice of the statute and all its requirements:' McClure *v.* Oxford, 4 Otto 432.    The Supreme Court of this state, speaking upon this subject, in relation to the railroad bonds of this county, used this language: 'Every holder and receiver of the bonds had notice,  *  *  *  for there on the face of the bond, it was plainly said it was 'given in pursuance of the

[Commonwealth v. Councils of Pittsburgh.]

Act of Assembly of the 24th of February 1853.' That act was a public law, of which brokers and their customers were bound to take notice, as well as other people. In the bond there was an express reference to the act, and in the act the condition was expressed in unmistakable English: Commonwealth ex rel. Allegheny County, 8 Casey 230.

"And this knowledge on the part of the relator is charged in the return, admitted by the demurrer, and conceded by his counsel.

"Under these circumstances, the bondholder can blame no one but himself, if he failed to know that these bonds had not been issued by city authority; that he had no contract with, nor claim upon the taxpayers of the city, and that he must look to the fund which the statute provided for his payment; and that it would be a great wrong upon the citizens of Pittsburgh, could they be taxed to pay either principal or interest.

"In my opinion, the mandamus should be refused."

The entry of the judgment was assigned for error.

*George Shiras, Jr.*, and *John G. Johnson*, with whom was *M. W. Acheson*, for plaintiffs in error.—The bonds in question are obligations of the city of Pittsburgh, expressly authorized by Act of Assembly, and were issued for municipal improvements made under and in pursuance of ordinances duly enacted by the city councils, and the holders are bona fide holders for value, and the proceeds of the same have been applied to the payment of the cost of improvements. No objection can be urged against the Penn Avenue legislation on the ground that the improvements were made under the direction of commissioners elected for the purpose by the owners of the abutting properties: Philadelphia v. Field, 8 P. F. Smith 320. The bonds in question having been issued for local and authorized municipal debts, are valid obligations of the city and binding upon it according to their tenor: Commonwealth ex rel. Reinboth v. Councils of the City of Pittsburgh, 5 Wright 278; City of Williamsport v. Commonwealth, 3 Norris 487. Municipal corporations may issue their bonds for a local and authorized debt under their general corporate powers; it is a power necessary to its existence: Allegheny City v. McClurkan, 2 Harris 83. Parties holding bonds are not required to look to the property holders for payment, because they deal directly with the city and not with such owners. The provision for the assessment of the costs of the city improvements upon abutting properties was for the benefit of the city: City of Pittsburgh v. Biggert, Pittsburgh P. L. J., March 6th 1878, vol. 8, new series, p. 113; 5 W. N. C. 281; Commonwealth ex rel. Middleton v. Commissioners, 1 Wright 277; State v. Commissioners, 6 Ohio St. 282; Commonwealth v. Allegheny, 7 Wright 400; Gas Light Co. v. New Orleans, The Reporter, August 28th 1878.

[Commonwealth *v.* Councils of Pittsburgh.]

The debts for the improvements of the city in question, aggregated upwards of five millions of dollars at the time the contract for the same was made. This was in fact prior to the adoption of the new Constitution. The bonds issued did not create an increase in the debt of the city, but were so issued for the purpose of providing funds to pay existing indebtedness. The return shows that $2,134,600 of the bonds were issued prior to January 1st 1874, and although the rest were issued subsequently, it is not averred that the contracts for improvements represented by these bonds were entered into after that date. Every intendment is to be taken against the return: Commonwealth ex rel. *v.* Commissioners of Allegheny County, 1 Wright 227; Commonwealth ex rel. Middleton *v.* Commissioners, *supra;* Moses on Mandamus 213; High on Extraordinary Remedies, sect. 474. The provisions of the new Constitution do not apply: Lehigh Iron Company *v.* Upper Macungie Township, 31 P. F. Smith 482; Indiana County *v.* Agricultural Society, 4 Norris 357; Watson *v.* Chester & Delaware Railroad Co., 2 Id. 254; Perkins et al. *v.* Slack, 5 Id. 270; County *v.* Sharswood, 7 W. & S. 16; Philadelphia *v.* Field, 8 P. F. Smith 320; Thomas *v.* Leland, 24 Wend. 65; Ahl *v.* Rhodes, 3 Norris 319; Ossipee Hosiery Co. *v.* Canne, 2 Am. Law Times Rep. (N. S.) 514.

The relator is entitled to the writ of mandamus: Commonwealth ex rel. Hamilton *v.* Councils of Pittsburgh, 10 Casey 496; Commonwealth ex rel. Middleton *v.* Commissioners, *supra;* Commonwealth ex rel. Armstrong *v.* Same, 1 Wright 277; Von Hoffman *v.* City of Quincy, 4 Wall. 535; High on Ex. Rem., sect. 369; Perkins *v.* Slack, *supra.*

*D. T. Watson, J. F. Slagle* and *Thomas M. Marshall*, with whom was *Thomas S. Bigelow*, City Solicitor, for defendants in error.—Relator must establish a specific legal right before he is entitled to a writ of mandamus: Commonwealth *v.* Henry, 13 Wright 538. He must also show it is the duty of councils to make the levy, and the authority so to do: Cooley's Taxation 524; Cooley's Const. Limit. 517–8. A city has only such powers as are expressly granted to it: Southside Railroad Co. *v.* City, 11 Wright 323; Commonwealth ex rel. *v.* Erie & Northeast Railroad Co., 3 Casey 351. The power in this case was delegated to the commissioners elected by the property owners abutting upon streets to be improved, and not by the city of Pittsburgh. The power being discretionary with councils, mandamus will not lie: Schlaudecker *v.* Marshall, 22 P. F. Smith 201; 10 Casey 517; High on Ex. Rem., sect. 479.

Where a party deals with a municipal corporation upon the assumption that it had powers, which in point of fact were not delegated, he cannot recover, although the city officials represent that the municipality had such powers: Cooley's Const. Lim. 196; Reed

[Commonwealth v. Councils of Pittsburgh.]

v. Toledo, 18 Ohio 161; City of Leavenworth v. Norton, 1 Kansas 432; Rhinelander v. New York, 24 How. Pr. Rep. 304; City of Lafayette v. Cox, 5 Indiana 39; McCracken v. San Francisco, 16 Cal. 620; Farmers' Loan Bank v. Carroll, 5 Barb. 649. A municipality must contract in the mode directed, or the contract is not binding upon it: Bank of United States v. Dandridge, 12 Wheat. 64; Lottman v. San Francisco, 20 Cal. 102; Nicholson Pavement Co. v. Painter, 35 Id. 705; Police Jury v. Brinton, 15 Wall. 566; Commissioners v. Carter, 2 Kansas 115.

Taxes must be levied in the manner prescribed by the statute: Reed v. Toledo, *supra*; Mayor v. Ray, 19 Wall. 478; City of Baltimore v. Reynolds, 20 Md. 1.

Holders of municipal bonds are bound to take notice of the statute and its requirements, if the same is referred to in the bond: McClure v. Township of Oxford, 4 Otto 432. The legislature cannot pass an act impairing the obligations of a contract, and the Act of May 16th 1857 was a contract with the then existing wards of the city, that if the property in them should pay the assessed cost of the street improvements, never afterwards should they be taxed for improvements: Western Savings Bank v. Philadelphia, 7 Casey 175, 181, 182; Philadelphia v. Fox, 14 P. F. Smith 181; Dartmouth College v. Woodward, 4 Wheat. 578; Binghampton Bridge, 3 Wall. 51.

If money was in the treasurer's hands, the owners of bonds for the payment of which it was pledged, would be entitled to mandamus to compel its application, and it does not appear by the return that there are any such moneys in the hands of the treasurer; therefore, a mandamus in this case cannot issue: Maenhart v. New Orleans, 2 Woods 108. Where there is a general liability of a corporation acting under special power, such liability occurs only upon the failure to perform the duty imposed by law upon the corporation, and after the remedy provided by the act has failed: Dillon on Mun. Cor., sect. 401–2; Burroughs on Taxation, p. 492.

The difficulty in enforcing the remedy designated will not justify resort to another means of payment not provided by law: Neuse River Nav. Co. v. Newbern, 9 Foster 146; Reese v. Waterman, 19 Wall. 117.

Payment of these bonds is imposed upon a limited district, and the assessments to pay the same cannot be made upon the city at large: People v. Brooklyn, 4 N. Y. 430; State v. Leavenworth, 2 Kansas 61; Ackerman v. Deshler, 37 Ark. 457.

Mr. Justice Paxson delivered the opinion of the court, November 18th 1878.

The Act of 2d April 1870, entitled "An act to provide for the improvement of Penn Avenue, and other avenues and streets in the city of Pittsburgh," Pamph. L. 796, bears upon its face, the evi-

7 Norris—6

Commonwealth *v.* Councils of Pittsburgh.]

dence that the legislature intended a system by which the city of Pittsburgh should be enabled to extend its streets and avenues from time to time, as required for its convenience or pleasure.   The immediate occasion of the passage of the act, was probably the large extension of the city limits by the Act of 1867.   Said extension embraced a considerable amount of strictly rural territory, used and cultivated for the most part as farm lands.   It was considered desirable, during a period of inflation, and in the midst of expanding values, to open broad avenues for miles through these farms, to grade down hills, fill up ravines, and curb and pave the avenues in a costly manner.   The Penn Avenue Act may be regarded as the result of this condition of things.   We will not stop to discuss its wisdom.   It is enough to say it was passed with all the forms necessary to a legal enactment, and its 25th section provides that said act should not take effect "until the councils of the city of Pittsburgh shall have approved thereof."   The city councils having approved of it, and proceeded to act under it in the opening of its avenues, the city must be held to the full measure of its legal responsibility therefor.

Without going into unnecessary detail the principal features of the act are those providing for the election of commissioners by the owners of property abutting on the street to be improved, whose duty it is declared to be to control and superintend the grading, curbing and paving; the payment of the cost of the work from the proceeds of sales of bonds of the city; the assessment of the cost upon the abutting property, which was made payable in ten equal annual instalments, with seven per cent. interest, thereby creating a fund to be applied under the direction of the finance committee of councils, to the payment of interest on, and the redemption of the bonds.   Under the system thus briefly sketched, Penn Avenue and several other streets and avenues have been graded and paved, and bonds of the city, amounting to over $5,000,000, have been sold in the market, the proceeds paid into the city treasury, and drawn out upon the orders of the commissioners, in payment of the cost of the improvements referred to.   For several years the city paid the interest upon these bonds with promptness, but defaulted for the year 1877, and has paid no interest since.

The relator, Henry Whelen, is the owner of $9500 of these bonds, and is the agent of several corporations and individuals, who are large holders of the same.   In February 1878 he presented his petition to the court below, praying the said court to award a writ of alternative mandamus, commanding the councils of said city to show cause why they should not provide for the payment of the interest.   To the writ thus granted, a majority of the councils made a return denying the liability of the city upon the bonds.   The relator filed a demurrer to the return.   The president judge of the court below, being the owner of some of the bonds, declined

[Commonwealth v. Councils of Pittsburgh.]

for that reason, to sit at the hearing. The remaining two judges differed in opinion. In order, however, that the case might be brought to this court, they entered judgment for the defendants, and refused the writ of peremptory mandamus. To the judgment thus entered this writ of error was taken.

That the writ of mandamus is a proper and appropriate remedy in such cases is settled law. We need only to refer to Commonwealth ex. rel. Hamilton v. The Councils of Pittsburgh, 10 Casey 496; Commonwealth ex. rel. Middleton v. Commissioners of Allegheny County, 1 Wright 237; Commonwealth ex. rel Armstrong v. Same, Id. 277; Von Hoffman v. The City of Quincy, 4 Wallace 535; Perkins et al. v. Slack, 5 Norris 270. The relator having selected the proper remedy it remains to be seen whether he has shown such a case as entitles him to the writ. That the facts set forth in his petition establish a prima facie case is too clear for argument, and must prevail unless the defendants have set out such matters in their return as relieve them from responsibility.

We need not go over in detail the grounds of defence specified in their return. They may be reduced to two heads: 1st. That the bonds issued under the Act of April 2d 1870 (Penn Avenue Act) and its supplements, do not constitute part of the funded debt of the city of Pittsburgh; that the holders of said bonds are bound to look for the payment of interest thereon, and to become due, to the assessments made under the provisions of said act upon the properties abutting upon the streets and avenues improved; and that no authority or power has been given or delegated to the councils of the city to levy a general tax, or any tax, to pay the interest on said bonds, or to apply any moneys out of the general revenues of the city for that purpose. 2d. That the bonds in question were issued in disregard of that provision of the Constitution which limits the debt of the city; and on the requisition of commissioners, without any previous appropriation made for their payment by councils, as required by the Constitution. We will consider these propositions in the order in which they are stated.

The first material question is, are the bonds in controversy the bonds of the city of Pittsburgh, and for which the city is directly liable to the holders for the payment of both principal and interest? That they are so in form is manifest. They purport to be the bonds of the city; are signed by the mayor and controller, countersigned by the Penn Avenue commissioners, and have the corporate seal affixed. And for the true and faithful payment of the sum of money mentioned in each bond, and the semi-annual interest thereon as aforesaid "the faith, credit and property of the city of Pittsburgh" are therein solemnly pledged. So that if the bonds were issued by authority of law, upon a sufficient consideration, there can be no doubt but that they are the bonds of the city. No question has been made as to the consideration. It is not denied that

the holders paid par for them in good money, and that the proceeds
went into the city treasury. Were they issued in pursuance of law?
It is admitted that they were issued under section 12 of the Penn
Avenue Act, which section is as follows: "For the purpose of pro-
viding for the payment of the cost and expense of said improve-
ments the said commissioners shall be authorized from time to time
as the work progresses, to make requisition upon the mayor of the
city of Pittsburgh for the issue of bonds of said city, in such sums
as they deem best; and it shall be the duty of the said mayor to
make and execute bonds in the name of said city to an amount not
exceeding the amount of the contract price for said work, and the
incidental expenses attending the same; said bonds shall be known
as Penn Avenue bonds; they shall be signed by the mayor and
countersigned by the controller, and sealed with the corporate
seal of said city; they shall be all of the same date, and they shall
be payable twelve years after date, and redeemable at any time, at
the option of said city; they shall bear interest at the rate of seven
per centum per annum, payable semi-annually from date, princi-
pal and interest payable at the office of the treasurer of the city
of Pittsburgh; the said bonds shall be free of taxation." Every
street or avenue improved under the Penn Avenue Act and its
supplements, was so improved by virtue of an ordinance of the city
councils directing the grading and paving thereof in accordance with
the provisions of said acts, and authorizing the election of commis-
sioners by the owners of the abutting properties. Each bond issued
by the city has a recital of the ordinance authorizing the improve-
ment of the street or avenue for which it was issued. The con-
tract for each improvement was made in the name of the city, and
the security for the faithful performance of the work was in each
instance given to the city. Here, then, we have the case of bonds
issued in the name and under the corporate seal of the city, the
proceeds of which went into the city treasury and were drawn out
upon orders for the payment of the debts of the city, lawfully con-
tracted in the course of its municipal improvements. That all this
was done through the interposition of a commission, amounts to
nothing. That such commissions created by the legislature may
lawfully bind a municipality, was expressly ruled in the City of
Philadelphia *v.* Field, 8 P. F. Smith 320. But these commissions,
if not created by the direct action of the city councils, were cer-
tainly raised up with their consent. We need not argue that a
municipal corporation may give its bond or other evidence of indebt-
edness for a debt lawfully contracted in the proper performance of
its municipal duties. That question is settled by Commonwealth ex
rel. Reinboth *v.* The Councils of the City of Pittsburgh, 5 Wright
378; City of Williamsport *v.* Commonwealth ex rel. Bair, 3 Nor-
ris 487.

It was urged, however, that notwithstanding the fact that

[Commonwealth *v.* Councils of Pittsburgh.]

the bonds were issued by the city, and upon their face pledge the faith and credit of the city for their payment, yet that the holders must look for the payment of their interest to the street assessments upon the properties abutting upon the avenues. There is nothing in the case to indicate that such was the understanding or agreement of the parties at the time the bonds were sold. On the other hand, there are persuasive reasons to show that it was not. These bonds were sold at par. The 14th section of the Act of 2d April 1870, required that they should be sold at not less than par. That they could have been disposed of at par, or indeed for any considerable sum, had it been known that the holders were to look for payment to the municipal assessments upon abutting property, is a proposition too absurd for discussion. It is not alleged that the city at any time, or at any place, gave notice to anybody that these bonds, though issued by her over her corporate seal, were payable out of street assessments. It is true, each bond contained the statement that it was issued for the improvement of a certain avenue, in pursuance of the before-recited Act of 2d April 1870. It is conceded that the bondholders are bound by the terms of that act, for the reason that it is the authority upon which the bonds were issued. But I have looked in vain through the act for anything to show even a glimmering of legislative intent that the bondholder should look to the street assessments for his pay. Such a provision, if apparent upon the face of the act, must necessarily have rendered it wholly abortive. The whole plan depended upon the ability of the city to borrow the necessary amount of money. In construing this act, therefore, we are not to assume that the legislature intended to do that which would entirely defeat the object of the act itself. We do not regard it, however, as of doubtful interpretation. It clearly makes the city responsible. By the 12th section, as well as by the express terms of the bonds themselves, the city is to pay the interest semi-annually from the date of the bonds, whereas by the 18th section, the first instalments of the assessments are not payable until the first day of October succeeding the time of the assessment. By section 16 the assessment is not to be made until after the improvement is completed; and the basis for the assessment is the amount of the bonds previously sold. By section 22 it is provided that "all moneys received from assessments shall be appropriated, under direction of the finance committee of the councils of the city of Pittsburgh, to the payment of the interest, and the redemption of the bonds which may be issued for said improvement; if any interest shall become due on said bonds, when there is no fund from which to pay the same, the councils of the city of Pittsburgh shall be authorized to make a temporary loan for the purpose of paying the same."

Surely, it was never heard that an Act of Assembly authorized the councils of a city to make a temporary loan to enable them to

[Commonwealth *v.* Councils of Pittsburgh.]

pay money which the city did not owe.    An examination of these
sections, as well as the entire scope of the act, leads us irresistibly
to the conclusion that the legislature did not intend that the bond-
holders should depend for the payment of their interest upon the
street assessments.    Had such been the intention of the legislature,
it would have been expressly so provided.    Good faith to the bond-
holders required that they should have been told so in explicit
terms.

The system of municipal assessments is not new.    It has been in
use for a long time, and is well understood.    Streets are being con-
stantly paved and sewers constructed, the cost of which is by
authority of the legislature assessed upon the abutting property.
Yet it has never been held that the city contracting for such work
can turn the contractor over to the property owners for his pay,
unless he agrees to look to them for payment.    The plain object of
the provision in the Penn Avenue Act for the assessment of the cost
of the street improvements upon the abutting properties, was to pro-
vide a fund out of which the city should be reimbursed, in whole or
in part, for the outlay.    The bondholders have nothing to do with
it.    They have no contract relation with the property owners as
such, nor have they any right to enforce the payment of the assess-
ments.

If the bonds in question are bonds of the city, then the duty of
the city councils to include the interest as it accrues in the annual
appropriation ordinance, and to provide for its payment by a levy
of sufficient taxes, is clear.    Section 3 of the Act of 6th April 1850,
Pamph. L. 407, makes it the duty of councils to assign and appro-
priate the revenue of said city derivable from all sources, and in
case of a deficiency, preference shall be given to the payment of the
interest on the funded debt of the city.    The Act of April 15th
1867, Pamph. L. 1258, removes all limitations and restrictions con-
tained in prior Acts of Assembly, upon the power of the city to
raise money by a tax levy to pay the interest upon the city debt
and for other city purposes; while the tax rate is to be adjusted so
as to meet the liabilities of the city.    The second section of the Act
of 19th of March 1873, Pamph. L. 317, provides "that the coun-
cils of the said city of Pittsburgh shall hereafter make the appro-
priations during the month of January or February in each and
every year, in the manner prescribed by the said Act of April 6th
1850."    This act (19th of March 1873) was after the Penn Avenue
legislation, and after the issue of bonds thereunder had commenced.

A further objection was made to the bonds, that they were issued
in violation of art. 9, sect. 8, of the Constitution, limiting the debt
of municipal corporations.    It is a sufficient answer to this to say,
that the section of the Constitution referred to does not apply.    It
is prospective in its operation.    The same remark may be made in
regard to the further objection, that the bonds were issued without

[Commonwealth *v.* Councils of Pittsburgh.]

any previous appropriation made for their payment by councils, as required by the present Constitution. It appears from the return that $2,134,600 of the bonds were issued prior to the 1st of January 1874. The remainder were issued after that date. But we gather from the record that the contracts for the improvements for which the later bonds were issued, were entered into prior to January 1st 1874. It was the contracts that increased the debt of the city. The issuing of bonds to raise money to pay the liabilities of the city under the contracts, was but the exchanging of one form of indebtedness for another. It did not increase the debt. That the sections in the Constitution invoked by the defendants do not apply to their case, we think is settled by Lehigh Iron Co. *v.* Lower Macungie Township, 31 P. F. Smith 432 ; Watson *v.* Chester and Delaware River Railroad Co., 2 Norris 254 ; Indiana County *v.* Agricultural Society, 4 Norris 357 ; Perkins et al. *v.* Slack, 5 Id. 270.

We are all of opinion that the bonds in controversy are the bonds of the city of Pittsburgh, and a part of its funded debt ; that they were issued by lawful authority and for a sufficient consideration ; and that honor, good faith, and the law of the land alike require that the city should provide for their payment.

> The judgment is reversed, and judgment is now entered for the relator upon the demurrer ; and it is further ordered that a writ of peremptory mandamus issue to the Select and Common Councils of the city of Pittsburgh, commanding said councils to forthwith make full and ample provision for the payment of all interest now due on said bonds, and the interest as it shall become due ; and further commanding the said councils to assign and appropriate out of the revenue of the said city, derivable from all sources, sufficient moneys for the payment of the interest of the funded debt of said city, so as aforesaid in arrear, and to become due, giving preference, if any deficiency should arise, to the payment of said interest before the payment of salaries of city officers and the ordinary current expenses of the city.

Chief Justice AGNEW filed the following concurring opinion :

I concur in the judgment of this case. I think the entire Penn Avenue Act bears conclusive evidence of the intent of the legislature that the money for the *immediate* construction of the avenue should be raised by loan on the faith and credit of the city, and then that the city should be reimbursed by assessments upon the property-holders, payable in annual instalments. The only evidence the lender of the money has for his debt is the bond of the city, and this was to be issued by the city, through her proper officers.

The law is the *express* authority for the debt, and the bond-holder had no other security. He has nothing to do with the assessment in any form, and nothing to do with its collection. It formed an inducement to make the loan, because it would put the city in the possession of the means of payment, but it was not made even as a collateral security in the hands of the lender himself. He cannot control it.

The decision in Seely's Case, 1 Norris 360, was against the legality of the assessment, on the ground that the charge per foot front was a gross and palpable violation of the taxing power, and has nothing to do with the question before us now. That pertained to the relation between the city and the property-owners—this to the relation between the city and her creditors, the lenders of the money.

But the learned judge who delivered the opinion of this court refers to the Williamsport bond case as if it had some bearing on this case; and I notice that an impression is created that it has. This *dictum*, and consequent impression, make it necessary that I should distinguish this case, otherwise I could not concur.

I shall not repeat what I said then, but shall merely state the points in which that case differs. There the law gave authority to issue bonds only to the sum of $200,000. The officers of the city actually issued and delivered an excess over this sum of $450,000, or $650,000 in all of negotiable bonds, and sold them at various rates of discount, from thirteen to thirty-seven per cent. This over-issue was justified upon an *implied* power to issue them in payment of debts—a doctrine in my judgment founded in no authority of law, and subversive of the right of property and the welfare of the people. It is unfounded also in any authority derived from the people, who are represented in a *municipal* corporation, a *public body*, only to the extent that the laws creating the municipality confer power upon the officers elected to carry out the law. These laws convey the only authority of the people, whose officers are not agents, but persons elected to perform legal duties.

At the time when that decision was made, the city of Philadelphia had a floating debt exceeding eleven million dollars. If by a mere *implication* from the creation of a debt for ordinary corporate purposes, a power can be inferred to issue negotiable bonds to be sold in the market to raise money, on terms determined by the city councils, I see no reason why the councils may not, under the Williamsport decision, fund the whole of the floating debt, and as that city raises less revenue than her expenditures, why this funding process may not go on for ever, or at least until the *maximum* allowed by the new Constitution shall be reached; or it comes into conflict with some other provision. This was the latitudinarian doctrine, to which I objected in the Williamsport case, and to which I would again object, if it were in this case.

This brings out as fully as I think it necessary, in a short opinion,

the difference between the two cases.  Here, Pittsburgh, by the Penn Avenue Act, is *expressly* authorized and commanded to issue her bonds for the money to improve the avenue.  There Williamsport had authority to issue only $200,000 in city bonds, and an over-issue of $450,000 (it might have been so many millions so far as the question of power is involved), was defended on the ground of an *implied* authority.  The difference is plain.  Hence, I concur here because of the express authority of law, while I dissented there because of the want of this authority.